## No. 23-30072

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Sugartown United Pentecostal Church, Inc.,
*Plaintiff-Appellee*

v.

Church Mutual Insurance Company, S.I.,
*Defendant-Appellant.*

On Appeal from the United States District Court for the
Western District of Louisiana, Lake Charles Division
Civil Case No. 2:21-cv-01672

**BRIEF OF APPELLEE**

Jeremy Gaston
Texas State Bar No. 24012685
jgaston@hcgllp.com
HAWASH CICACK & GASTON LLP
3401 Allen Parkway, Suite 200
Houston, TX 77019
(713) 658-9015 (tel/fax)

Clint Brasher
Louisiana State Bar No. 29540
clint@brasherattorney.com
Nishi Kothari
Louisiana State Bar No. 39655
nishi@brasherattorney.com
BRASHER LAW FIRM, PLLC
1122 Orleans St.
Beaumont, Texas 77701
(409) 832-3737 (tel)
(409) 832-3838 (fax)

*Counsel for Appellee*

**ORAL ARGUMENT REQUESTED**

## CERTIFICATE OF INTERESTED PARTIES

1.  Case Number and Style in the United States District Court for the Western District of Louisiana (Lake Charles):

    No. 2:21-cv-01672, *Sugartown United Pentecostal Church, Inc. v. Church Mutual Insurance Company*, S.I.

2.  The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

| Defendant/Appellant: | Counsel: |
|---|---|
| Church Mutual Insurance Company, S.I. | Sidney W. Degan<br>sdegan@degan.com<br>Travis L. Bourgeois<br>tbourgeois@degan.com<br>DEGAN, BLANCHARD & NASH<br>400 Poydras Street, Suite 2600<br>New Orleans, Louisiana 70130<br>Telephone: (504) 529-3333<br>Facsimile: (504) 529-3337 |
| | Daniel A. Webb<br>dwebb@beahm.com<br>Laken N. Davis<br>ldavis@beahm.com<br>BEAHM & GREEN<br>145 Allen Toussaint Blvd., Suite 400<br>New Orleans, Louisiana 70124<br>Telephone: (504) 288-2000<br>Facsimile: (504) 288-2099 |

| Plaintiff/Appellee: | Counsel: |
|---|---|
| Sugartown United Pentecostal Church, Inc. | D. Clinton "Clint" Brasher<br>clint@brasherattorney.com<br>Nishi Kothari<br>nishi@brasherattorney.com<br>Joseph Muckleroy<br>joe@brasherattorney.com |

i

BRASHER LAW FIRM, PLLC
1122 Orleans St.
Beaumont TX 77701
Telephone: (409) 832-3737
Facsimile: (409) 832-3838

Jeremy Gaston
jgaston@hcgllp.com
HAWASH CICACK & GASTON LLP
3401 Allen Parkway, Suite 200
Houston TX 77019
713-658-9015 (tel/fax)

          */s/ Nishi Kothari*
          Nishi Kothari

        ***Counsel of Record for Appellee***
***Sugartown United Pentecostal Church, Inc.***

## STATEMENT REGARDING ORAL ARGUMENT

As a factual matter, this case is fairly simple: the Church suffered hundreds of thousands of dollars in property damages from Hurricane Laura, and a jury found that its insurer, Church Mutual, had acted arbitrarily, capriciously, or without probable cause because, among other reasons, it conducted an inadequate investigation and only paid $4,138.78 for the claim.

That said, Church Mutual has done a good job of making things look complicated legally, including by raising many appellate issues. As shown herein, however, most of its complaints are subject to highly deferential standards of review, and while sometimes that is for obvious reasons (*e.g.*, making no charge objections), other times it is less so (*e.g.*, when it invited potential error with its own witnesses' testimony).

Because of the sheer number of issues and because the standards of review in some instances involve nuanced aspects of the record, the Church believes oral argument could materially assist this Court's decisional process.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT .............................................................. iii

INDEX OF AUTHORITIES ............................................................................................. vi

ISSUES PRESENTED ..................................................................................................... ix

STATEMENT OF THE CASE ............................................................................................ 1

    A.    Before Hurricane Laura, the Church's facility was in good condition, with no known defects or areas needing repair. ........................ 1

    B.    After Hurricane Laura, Church Mutual failed to pay for damages that the Church undeniably incurred, even according to its own adjuster ........................................................................................................ 2

    C.    The jury unanimously determined that the Church suffered over $220,000 in covered damages; that Church Mutual failed to pay any of that within 30 days of satisfactory written proofs of loss; and that Church Mutual acted arbitrarily, capriciously, or without probable cause in handling the Church's claim. ..................................... 10

SUMMARY OF ARGUMENT ......................................................................................... 12

STANDARDS OF REVIEW ............................................................................................ 16

    A.    Rebuttal Witnesses ......................................................................................... 16

    B.    Conduct that is Arbitrary, Capricious, or Without Probable Cause ........ 16

    C.    Jury Findings, Motions for New Trials and Judgment as a Matter of Law ............................................................................................................ 17

    D.    Golden Rule Violations ................................................................................. 18

    E.    Other Issues .................................................................................................... 18

ARGUMENT ............................................................................................................... 19

I.    The district court had discretion to let the Church call a rebuttal witness to address issues not timely disclosed before trial; in addition, Church Mutual failed to preserve any error. .............................. 19

    A.    The district court had discretion to let the Church call a rebuttal witness to address issues not timely disclosed before trial. ................... 19

    B.    Church Mutual failed to preserve any error on this issue. ...................... 23

II.    Church Mutual failed to pay the Church's claim within thirty days of receiving satisfactory written proofs of loss. .................................. 24

III.   Substantial evidence supported the jury's finding that Church Mutual's conduct in handling the Church's claim was arbitrary, capricious, or without probable cause. ...................................................................28

IV.   Church Mutual cannot escape the jury's finding of bad conduct simply because it paid experts to disagree with the Church's experts. .......................31

V.   The jury was not required to determine actual cash value based on prices as of the date of loss and, even if that were the standard, Church Mutual waived any error by not properly objecting to the charge. .................35

VI.   The Church's use of a demonstrative showing agreed-upon industry rules and standards was not error, let alone harmful. ......................................42

VII.   The Church did not ask the jury to put themselves in the plaintiff's shoes, let alone award damages on any such basis, nor can Church Mutual show harmful, let alone plain, error. ...................................................46

VIII.  Church Mutual's remaining issues are subsumed within the above arguments. ..........................................................................................................54

CERTIFICATE OF COMPLIANCE ...................................................................56

CERTIFICATE OF SERVICE ..........................................................................57

# Index of Authorities

## *Cases*

*Adams v. Brown & Root, Inc.*,
  688 F.2d 410 (5th Cir. 1982)........................................................ 18, 49

*Aghighi v. Louisiana Citizens Prop. Ins. Corp.*,
  119 So.3d 930 (La. Ct. App. 4th Cir. 2013) (writ denied)............................ 17, 29

*B. Bennet Mfg. Co. v. S.C. Ins. Co.*,
  692 So.2d 1258 (La. Ct. App. 5th Cir. 1997)....................................................33

*Bingham v. St. Paul Ins. Co.*,
  503 So.2d 1043 (La. Ct. App. 2d Cir. 1987)........................................................40

*Brown v. Parker Drilling Offshore Corp.*,
  410 F.3d 166 (5th Cir. 2005)........................................................ 18, 46

*Burrage v. Harrell*,
  537 F.2d 837 (5th Cir. 1976)..................................................................53

*Coleman v. School Board of Richland Par.*,
  418 F.3d 511 (5th Cir. 2005)..................................................................40

*Darby v. SafeCo Ins. Co.*,
  545 So.2d 1022 (La. 1989)....................................................................33

*Durio v. Horace Mann Ins. Co.*,
  74 So.3d 1159 (La. 2011)........................................................ 26, 32

*Gardiner v. Old Hickory Cas. Ins. Co.*,
  529 So. 2d 1324 (La. Ct. App. 5th Cir. 1988)..................................................34

*GuideOne v. Mount Carmel Ministries*,
  676 F.App'x 269 (5th Cir. 2017) ........................................................38

*Guillory v. Lee*,
  16 So.3d 1104 (La. 2009)......................................................................16

*Harris v. Imperial Fire & Cas. Ins. Co.*,
  328 So.3d 1208 (La. Ct. App. 1st Cir. 2021) ..................................................26

*Headrick v. Pennsylvania Millers Mut. Ins. Co.*,
  245 So.2d 324 (La. 1971)......................................................................34

*Hidden Oaks Ltd. v. City of Austin*,
  138 F.3d 1036 (5th Cir. 1998)................................................................17

*Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.*,
  471 F.2d 894 (5th Cir. 1973)..................................................................18

*In re Air Crash Disaster Near New Orleans, La. on July 9, 1982*,
   767 F.2d 1151 (5th Cir. 1985) .............................................................. 17

*In re Katrina Canal Breaches Litigation*,
   495 F.3d 191 (5th Cir. 2007) ................................................................ 40

*Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*,
   706 F.3d 622 (5th Cir. 2013) ................................................................ 16

*Longmire v. United States*,
   404 F.2d 326 (5th Cir. 1968) ................................................................ 18

*Louisiana Bag Co., Inc. v. Audubon Indem. Co.*,
   999 So.2d 1104 (La. 2008) ................................................... 25, 28, 30

*Montgomery v. State Farm Fire & Cas. Co.*,
   103 So.3d 1222 (La. Ct. App. 3rd Cir. 2012) (writ denied) .......... 28, 31

*Munoz v. State Farm Lloyds*,
   522 F.3d 568, 573 (5th Cir. 2008) ........................................................ 36

*Paul v . Nat'l Am. Ins. Co.*,
   361 So.2d 1281 (La. Ct. App. 1st Cir. 1978) (writ refused) .............. 26

*Reynolds v. Select Properties, Ltd.*,
   634 So.2d 1180 (La. 1994) .................................................................... 40

*Rodriguez v. Olin Corp.*,
   780 F.2d 491 (5th Cir. 1986) ................................................................ 16

*Sher v. Lafayette Ins. Co.*,
   988 So.2d 186 (La. 2008), *on reh'g in part* (La. 2008) ...................... 28

*State v. Turnbo*,
   966 So.2d 1220 (La. Ct. App. 3rd Cir. 2007) ...................................... 19

*Stokes v. Delcambre*,
   710 F.2d 1120 (5th Cir. 1983) .............................................................. 46

*Tramonte v. Fibreboard Corp.*,
   947 F.2d 762 (5th Cir. 1991) ................................................................ 16

*United Capitol Ins. Co. v. Pontotoc Elec. Co.*,
   No. 98-60195, 1999 WL 800009, at *1 (5th Cir. Sept. 14, 1999)
   (per curiam) (unpublished) ............................................................ 50, 51

*U.S. v. Arce*,
   997 F.2d 1123 (5th Cir. 1993) .............................................................. 51

*U.S. v. Brock*,
   833 F.2d 519 (5th Cir. 1987) ................................................................ 19

*U.S. v. Cochran*,
  697 F.2d 600 (5th Cir. 1983).......................................................... 52, 54

*U.S. v. Salazar*,
  751 F.3d 326 (5th Cir. 2014)...............................................................36

*U.S. v. Windham*,
  489 F.2d 1389 (5th Cir. 1974)..............................................................23

*Vogler v. Blackmore*,
  352 F.3d 150 (5th Cir. 2003)...............................................................17

*Wallner v. Ziegler*,
  470 F.App'x 230 (5th Cir. 2012) ..........................................................51

*Whitehead v. Food Max*,
  163 F.3d 265 (5th Cir. 1998)...............................................................52

*Wright Root Beer Co. of New Orleans v. Dr. Pepper Co.*,
  414 F.2d 887 (5th Cir. 1969)...............................................................16

*Zeitoun v. Orleans Parish School Board*,
  33 So.3d 361 (La. Ct. App. 4th Cir. 2010)............................................38

## Statutes and Rules

FED. R. APP. P. 25..................................................................................57

FED. R. APP. P. 32..................................................................................56

5TH CIR. R. 32.1...................................................................................56

LA. R.S. 22:1892 ........................................................ 24, 26, 27, 28, 29

## Other Materials

Maschke, Alena, *"Ground zero": One in five federal insurance lawsuits
  nationwide filed in Lake Charles*, THE ADVOCATE (Oct. 21, 2022), *available at*
  https://tinyurl.com/2madkrp7.................................................................48

MERRIAM-WEBSTER ONLINE DICTIONARY, *available at* https://www.merriam-
  webster.com/dictionary/rule...................................................................43

*Insurance Commissioner Recognizes those Affected by Hurricane Laura*, LA.
  DEP'T OF INS. (Aug. 19, 2021), *available at* https://tinyurl.com/2s3wr6ba.........47

## ISSUES PRESENTED

1. Whether the district court abused its discretion and caused harmful error by letting the Church call a rebuttal witness when (a) the witness addressed matters Church Mutual failed to timely disclose and (b) Church Mutual lodged no applicable evidentiary objection.

2. Whether the jury properly determined that Church Mutual failed to make required payments within thirty days of receiving satisfactory written proofs of loss, and, if not, whether any error would require anything beyond a $2,759.19 remittitur.

3. Whether the jury's finding that Church Mutual acted arbitrarily, capriciously, or without probable cause was manifest error, where despite the existence of over $220,000 in covered damages, Church Mutual conducted an inadequate investigation, paid only $4,138.78, and gave no basis for not issuing a supplement until nearly a year after the hurricane.

4. Whether an insurer can avoid a finding of bad faith conduct by finding experts who will report lower amounts of covered damages compared to the insured's experts.

5. Whether the jury was required to determine actual cash value based on prices as of the date of loss where: (1) the policy does not require it or, at worst, is ambiguous and so must be construed in the Church's favor; (2) Church Mutual failed to object to the jury charge's instruction on determining actual cash value; and (3) Church Mutual invited any error by its own adjusters and experts, who didn't determine actual cash value using the date of loss.

6. Whether the district court abused its discretion and caused harmful error by letting the Church display a demonstrative that used the word "rules" to refer to the governing standards for the insurance industry that were agreed to by Church Mutual's own adjuster, corporate representative, and claims-handling expert.

7. Whether the Church made any golden rule violation rising to plain error when its counsel and witnesses made truthful and unobjected-to statements as to the purpose and importance of insurance industry standards and the widespread difficulty that Louisiana insureds are facing in getting claims paid after Hurricane Laura.

8. Whether any other error alleged by Church Mutual reflects harmful or plain error, or any other type of legal error that would require a new trial, remittitur, or other judgment modification.

## STATEMENT OF THE CASE

**A.    *Before Hurricane Laura, the Church's facility was in good condition, with no known defects or areas needing repair.***

In 2016-17, the Church extensively remodeled its facility, installing a new HVAC unit, new wall paneling and insulation, and a new roof. ROA.2919. Then, in January 2020, the Church had the facility appraised by a certified general appraiser (Lopresto). ROA.2777-79.

Lopresto inspected every interior room, as well as the exterior, the roof, and the HVAC system. ROA.2781-84. His inspection went down to the "brick level," where he found no cracking or other problems. ROA.2784.

As to water issues, Lopresto found no leaks or anything else, apart from a few off-color ceiling tiles in one room, which he did not consider indicative of any HVAC problem, nor did he find it to be from any existing leak. ROA.2780; ROA.2782-84. Lopresto also inspected the other buildings on the property (sheds) and found no damage there either. ROA.2784.

In sum, Lopresto found no damages needing repairs as of January 2020. ROA.2787.

That same month, the Church agreed to a three-year insurance policy with Church Mutual. ROA.3466-67. As is customary, Church Mutual was free to inspect the building before writing the policy and, in fact, did so. ROA.3549-3553; ROA.3558-63; ROA.2709. Notably, seven months before the hurricane, Church Mutual found the Church's building and roof to be in "good" condition, and

expressly stated that there was no interior water damage or leaking/outdated plumbing. ROA.3551. Indeed, Church Mutual never claimed then that there were pre-existing conditions or other issues, let alone any needing to be fixed, before the Church would receive full coverage. ROA.2918.

**B.** ***After Hurricane Laura, Church Mutual failed to pay for damages that the Church undeniably incurred, even according to its own adjuster.***

On August 27, 2020, Hurricane Laura struck Louisiana as a Category 4 hurricane with sustained winds of 130 mph. ROA.4341. When Hurricane Laura hit, it was the strongest storm to make landfall in Louisiana since the 1850s. ROA.3308. As Church Mutual's own adjuster put it, Lake Charles "was devastated" and agreed that it "looked like a bomb went off." ROA.3036

At the Church, wind speeds reached 90-100 mph, and the building experienced a significant drop in barometric pressure. ROA.2848. According to the Church's engineering expert (Norman), such a drop represents a dynamic force that will "try to pull your building apart," ROA.252, and the associated energy was an aspect of Hurricane Laura more significant than prior strong storms like Hurricane Rita. ROA.2849.

Approximately three weeks later, the Church's electricity was restored, and it was able to report its loss to Church Mutual. ROA.2928; ROA.3568-69. In it its initial report, the Church expressly told Church Mutual that there was "lots of damage, water in sanctuary, . . . roof damage, doors not closing, ceiling tiles missing,

mold & mildew in sanctuary, [and] structural damage." ROA.3570.[1]

Despite the near-unprecedented impact of Hurricane Laura and despite knowing the Church's initial significant assessment of damages, Church Mutual set its loss reserves for the claim at *five dollars* before it ever inspected the loss. ROA.3571.

Nine days later Church Mutual sent a third party adjuster (Montano) to inspect the loss. ROA.4619. Montano spent only a short time at the property ROA.3043); did not go into the attic (ROA.3054) or even inspect all of the rooms (ROA.3058). He did not take moisture readings (ROA.3060); did not properly measure the roof (ROA.3069); and failed to obtain an external roof measurement report (ROA.3076-77), despite that being easy to do. Yet even in his limited inspection, Montano found wind damages to the roof and carport, and, in terms of the interior, water damage he viewed as a covered loss. ROA.3046; ROA.3049-50; ROA.4657-63.

At trial, the inadequacy of Montano's investigation was explicitly demonstrated, and even Montano acknowledged that he had mischaracterized covered damages when he admitted on the stand that he had photographed clear wind damage to the roof, yet notated the photo as showing no wind damage. ROA.3077-78. After Montano's inspection, Church Mutual set its reserves at $15,000 (again,

---

[1] As further proof Church Mutual knew it should take this claim seriously, an internal Church Mutual document suggests the Church first thought its damages might reach $500,000. ROA.3568.

despite knowing the Church had reported extremely high damages). ROA.3573.

The Church allowed Montano to speak with a contractor who the Church was considering using to make the repairs (Herring). ROA.4667-70. Herring disagreed with Montano's limited assessment of interior damage and offered to submit an actual moisture report. ROA.4669.

Both Montano and Church Mutual refused to consider that evidence, however. Instead, Church Mutual specifically told the Church that its contractor "could send what he wants," but that Church Mutual had already (*i.e.*, prematurely) concluded, that "coverage for the interior is going to be limited to the large assembly room." ROA.4669.

Montano issued his report on September 25, 2020. ROA.3599-607. Further, at no point did Montano believe <u>any</u> of the interior damages were related to an HVAC leak. ROA.3058. His report assessed $14,857 in covered losses, after depreciation, and recommended payment of $4,857,[2] which included all covered damages he found, including to the carport. ROA.3599-607.[3]

Despite Montano's recommendation that Church Mutual pay $4,857 – itself an absurdly low amount as a unanimous jury verdict ultimately confirmed – Church

---

[2] The Church was subject to a $10,000 windstorm/hail deductible.  ROA.3470.

[3] Montano concluded the carport was covered under the "structures on premises" endorsement because it was structurally equivalent to a pavilion. ROA.3602. Later, an internal Church Mutual adjuster confirmed that this carport/shed was covered under the same endorsement. ROA.4783.

Mutual never even paid *that* amount.[4] ROA.2743-49; ROA.3049-50; ROA.3651-52.

Montano ultimately learned that Church Mutual did not even follow his (limited) recommendations. ROA.4669. Then, at trial, he effectively admitted that Church Mutual's failure to do so, let alone within the required 30 days, could not be justified absent an actual need for further investigation, which Church Mutual had not at that time indicated it needed:

> Q:    Are you aware of any good reason why Church Mutual didn't make that payment within 30 days?
>
> A:    Unless they were doing more coverage investigation, no . . . .
>
> Q:    If Church Mutual did in fact pay most of your estimate, but did it outside of that 30-day window, would you have a problem with that?
>
> A:    I mean, the law would have a problem with it.

ROA.3053-54.

Nor was there ever any explanation for Church Mutual failing to pay for the carport before trial. ROA.2744 ("Q: If you go back to Exhibit 3, is there anything in the claims notes where it says, Hey, we evaluated your recommendation, Mr. Montano, but we don't believe that [the] carport is covered? A: No, no.").

After Montano's inspection, the Church received a letter dated November 16, 2020, which tendered $4,138.78 (*i.e.*, $718 *less* than what Montano reported in his

---

[4] In Montano's report, he confirmed conversations with Church Mutual that "other structures can be allowed for with a separate limit of $5,000." ROA.4668; *see* ROA.3052.

already-inadequate adjustment. ROA.3649).

Notably, the letter did not purport to deny any aspect of the Church's claim (*e.g.*, by citing any exclusions), rather, it expressly confirmed, with Montano's estimate attached, that Church Mutual believed some of the interior water damage was covered. ROA.3649-50; ROA.4657-66. The Church took the letter at face value: namely, that it was Church Mutual's final assessment of the Church's covered damage. ROA.2931. And in fact, Church Mutual closed the claim at this time (ROA.2734; ROA.3575) and never paid anything more.

Notably, even the payment of undisputedly covered damages was conclusively late under Louisiana law, as it occurred more than thirty (indeed more than fifty) days after Church Mutual received written proof of loss (Montano's September 2020 report), which was necessarily "satisfactory" as to what it agreed to cover. ROA.3053-54.

After receiving Church Mutual's letter, the Church hired Charles Norman, a licensed professional engineer and professor of structural and mechanical engineering at McNeese University, ROA.2835; a cost estimator (also used by Church Mutual as an adjuster, ROA.2959); and an expert in moisture analysis. ROA.2934; ROA.2965; ROA.2801-02.

These experts inspected the property multiple times, took moisture readings, interviewed witnesses, took hundreds of photographs, and prepared detailed reports establishing the damages at the Church. ROA.2802-03; ROA.2846-47; ROA.2854;

ROA.2965-66. Church Mutual received copies of their reports in May 2021, and they showed damages in excess of $268,000 before depreciation, deductible, and prior payments were accounted for. ROA.3653-903; *see also* ROA.2761.[5]

The reports were accompanied by a cover letter that explicitly stated that the reports were from building consultants relating to the claim, and that the Church was requesting payments for "all covered damages be paid promptly and within the state and contractual deadlines." ROA.3653. The Church specifically reminded Church Mutual that it believed satisfactory proof of loss was achieved on the date of Church Mutual's (Montano's) inspection, and that Church Mutual's duty of good faith was ongoing (meaning Church Mutual still needed to pay for covered damages after receiving this new information, within thirty days of receiving it). ROA.3653.

Facing the clear prospect of significant liability that it could and should had avoided months earlier – and instead of attempting to rectify the situation through any collaborative process (such as having Montano work with the Church's experts, ROA.3057) – Church Mutual instead hired MKA, a construction consulting firm that primarily provides consulting work for insurance companies. ROA.3170.

MKA put two main people on the project: an architect (Gonzalez) and an engineer (Fecke). ROA.3136-37. Notably, the engineer never visited the Church

---

[5] Church Mutual confirmed receipt of the Church's expert reports in May 2021 (ROA.3577), and its representative (Wiggins) confirmed this at trial. ROA.2762.

property, and although Gonzalez did go inspect it, he formed biased opinions before doing so: specifically, as he later admitted, he did not expect to see any major damage and, indeed, just believed there would be "minimal wind damage, if any." ROA.3176. Again, that's before he stepped foot on the property. ROA.3299.

After paying $22,383.60 for MKA's report, Church Mutual summarized its findings in an August 5, 2021 letter. ROA.3581; ROA.4782-85.

For the very first time – and nearly a year after the hurricane – Church Mutual raised exclusions as to why it would not cover *any* of the Church's interior damages. ROA.4782-85. Church Mutual also claimed that it had already paid the Church for damage to the carport. *Id*.

But that was false. Indeed, although such coverage was clear,[6] no payment has ever been made:

> Q:    He [Montano] gives you a number to pay that includes that carport under this extension of coverage, true?
>
> A:    Correct.
>
> Q:    And this policy, in fact, has those extensions of coverage, do they not?
>
> A:    Yes.
>
> Q:    And Church Mutual to this day has not paid for that coverage, isn't that correct?
>
> A:    Correct.
>
> Q:    And you testified just a minute ago that that's because you guys made a determination that it wasn't covered; isn't that

---

[6] ROA.4783 (noting the shed/carport coverage "was provided under the Structures on Premise Coverage Extension").

true?

A:      Yes, under the terms of the policy.

Q:      But this letter written August 25th. Does it say that they are
        not paying for the shed?

A:      No it does not.

Q:      It says in fact what, that they paid for it; isn't that right?

A:      Yes. . . . This was an error.

ROA.2748-49.

The Church's engineer (Norman) – an expert who has worked hurricane cases since 1969 (ROA.2835) – considered specific weather data regarding Hurricane Laura.  ROA.2847-48.

He testified that the area where the Church was located, Dry Creek, "went through the wind eye wall" (ROA.2848) and that changes in the barometric pressure had significant impact on the Church's structure. ROA.2849-53.

He also inspected the Church five times, conducted moisture testing, ROA.2846-47, and interviewed five witnesses present at the Church during the hurricane, and relayed their first-hand accounts as to what the Church's facility looked like (pre-storm versus post-storm). ROA.2854. At trial, he also gave a comprehensive review of the damages at the Church that were caused by Hurricane Laura. ROA.2850-64. The jury heard testimony regarding the proper way to fix the damages caused by Hurricane Laura, and the costs for that. ROA.2866-67; ROA.2967. By contrast, as mentioned above, Church Mutual's engineer (Fecke) had never been to the Church's facility. ROA.3299.

Indeed, more broadly speaking, no licensed professional engineer on behalf of Church Mutual has ever inspected the property; performed an analysis of weather data to see where the Church was in relation to the eye of the hurricane; considered (let alone determined) the impact of barometric pressure on a building; formed any opinion regarding the interior water damage at the Church as it relates to Hurricane Laura; or interviewed a single person from the Church. ROA.3299; ROA.3301-02; ROA.3304; ROA.3307; ROA.3309; ROA.3310.

---

Throughout this litigation, Church Mutual has tried to spin this case as a battle of the experts. It was no battle. One side provided thorough and expert documentation of a covered and substantial claim to the other, while the other failed to listen to its own adjuster, employed hired guns who barely drew their weapons, and otherwise dilly-dallied and low balled a situation despite the obvious – and later unanimously assessed – presence of actual, substantial, and covered damages roughly 98% of which Church Mutual has never paid.

**C.**   ***The jury unanimously determined that the Church suffered over $220,000 in covered damages; that Church Mutual failed to pay any of that within 30 days of satisfactory written proofs of loss; and that Church Mutual acted arbitrarily, capriciously, or without probable cause in handling the Church's claim.***

At the close of evidence, the district court instructed the jury regarding Louisiana law, including what constitutes satisfactory proof of loss; what constitutes "arbitrary, capricious, or without probable cause" behavior; what constitutes "actual

cash value"; and the burdens each party must carry. ROA.2145-53. <u>At the on-the-record charge conference, Church Mutual made no objections to the jury charge or any of those statements of law</u>. ROA.3029.

The jury unanimously found that Church Mutual's $4,138.78 payment was untimely, and that the Church's remaining covered losses totaled $223,825.91. ROA.2641-42. The jury also unanimously found that Church Mutual's dereliction in making timely and adequate payment of all amounts was arbitrary, capricious, or without probable cause. ROA.2641-42.

The district court entered judgment, including awards of attorney's fees and penalties that automatically follow under Louisiana law from such jury findings, ROA.2229-34.

Church Mutual has now appealed, complaining about one Church witness, one Church demonstrative, the district court's determination that part of the policy was considered ambiguous (despite no objection to the associated jury-charge instruction), and some witness testimony and attorney arguments (primarily regarding the societal importance of insurance rules, also never objected to).

Church Mutual tries to excuse its conduct based on the idea that an insurer is somehow "reasonable as a matter of law" if it can find and pay witnesses who disagree with an insured's experts, even where a jury obviously gave little or no weight to the insurer's experts.

## SUMMARY OF ARGUMENT

1. Right before trial, Church Mutual produced over 800 photos it had not previously disclosed despite specific discovery requests. Then, during trial, a Church Mutual expert gave testimony outside the scope of his report and on matters implicating the Church's claims. The district court thus had discretion to let the Church call a rebuttal witness. Moreover, Church Mutual's sole objection to the rebuttal witness was on erroneous procedural grounds (claiming that rebuttal witnesses must be disclosed before trial, which is incorrect). In turn, because Church Mutual made no evidentiary objections to the scope of the witness's testimony, Church Mutual has not preserved any conceivably relevant claim of error, let alone harmful error (and does not claim plain error).

2. On September 25, 2020, Church Mutual received a written proof of loss from its own adjuster, and its own corporate representative does not dispute receiving this. Then, despite receiving such proof, Church Mutual did not issue any payment until November 16, 2020. As such, the evidence conclusively established that this payment was past the thirty-day statutory window and thus untimely. Church Mutual's suggestion that such written proof had to come directly from the Church itself is unsupported in the law and, at worst, would only require a remittitur of $2,759.19 even if error.

More significantly (in dollar terms), Church Mutual received satisfactory written proof of loss in May 2021 directly from the Church itself that showed,

through multiple expert reports, over a quarter million dollars in damages. At the very least, Church Mutual owed the Church the duty to conduct a reasonable investigation and to pay for covered damages. But Church Mutual did not – and still has not – paid anything beyond its original and untimely payment of $4,138.78.

3.      Numerous lines of evidence showed that Church Mutual acted arbitrarily, capriciously, or without probable cause during its handling of the Church's claim, including: (a) failing to adequately inspect the property from the start, despite already knowing the Church was claiming hundreds of thousands of dollars in damages; (b) failing to send a licensed engineer to inspect the property, even after receiving multiple expert reports supporting a claim for hundreds of thousands of dollars in covered losses, and instead hiring experts to find ways to deny coverage; (c) failing to give any policy basis for paying no more than its original $4,138.78 payment until nearly a year after the hurricane; and (d) failing to ever pay damages that it represented it would pay and that its own adjuster believed were covered under the policy.

4.      Church Mutual believes it can avoid a finding that its claims handing was arbitrary, capricious, or without probable cause because it ultimately found experts who said the Church had lower covered damages than the Church's experts had determined. This idea – that a battle of the experts equates to a get out of jail free card – finds no support in law or common sense.  As to the law, cases uphold findings of bad conduct, even in the face of conflicting experts, absent "manifest

error," which Church Mutual hasn't even acknowledged as the standard. As to the facts, this was no "battle" of experts here. Rather, the Church provided thorough documentation of a substantial covered claim, while Church Mutual failed to listen to its own adjuster, employed an engineer who not only didn't inspect the facility and whose other methodological flaws were just as egregious, including failing to consider the proximity of the Church to the eyewall of the hurricane, failing to consider the structural impact of barometric pressures on the Church's facility, and failing to consider pre-loss photographs showing there were no leaks in the Church prior to the hurricane or any other damages beyond a few partially-discolored ceiling tiles.

5.    Church Mutual says the insurance policy is unambiguous and requires a determination of "actual cash value" damages as of the date of loss and, in turn, complains the jury was permitted to determine the amount of damages based on material and labor prices that existed some months after the date of loss.

Church Mutual is wrong about the policy because the policy contains multiple definitions of actual cash value, and the one at issue does not include Church Mutual's desired limitation, thereby making the policy ambiguous. More fundamentally, even if one could interpret the policy as Church Mutual wants to, the Church's reading is at least reasonable and thus must be chosen under Louisiana law since this is an insurance policy. Separately, although Church Mutual raised this issue in a pre-trial motion, it failed to preserve any claim of error because it did not

make any objection to the jury charge's instructions regarding the determination of actual cash value. It also invited any conceivable error because it presented witnesses, including its expert and adjuster, who didn't use prices as of the date of loss to calculate loss values.

6. The district court permitted the Church to use a demonstrative showing industry rules and standards that govern the handling of claims by insurance companies. Church Mutual's own expert, corporate representative, and adjuster agreed that these rules were, in fact, actual industry standards. The Church also never suggested to the jury that any of these rules or standards were "rules of law," as Church Mutual claims. As such, there was no abuse of discretion, let alone harmful error.

7. During opening, closing, and with one witness, the Church conveyed the point to the jury that insurance industry rules and standards are both necessary and important to the community and that many Louisiana insureds had difficulties getting Hurricane Laura claims paid, as reflected by substantial litigation on such issues. All of these points were true and supported either by indisputable data sources or witness testimony, none was objected to at the time, and – most fundamentally – nothing said by the Church's witness or counsel ever asked the jury to step into the shoes of the Church as a basis for awarding damages, which is the one recognized argument that constitutes a golden rule violation. Church Mutual thus cannot show error, let alone the plain error it would need to show here.

STANDARDS OF REVIEW

### A.    *Rebuttal Witnesses*

Church Mutual gives the wrong standard of review for rebuttal witnesses. Church Mutual's Brief 16 (claiming the issue gets *de novo* review here).  The correct standard of review is abuse of discretion. *See Wright Root Beer Co. of New Orleans v. Dr. Pepper Co*., 414 F.2d 887, 892 (5th Cir. 1969) (reviewing allowance of rebuttal witness under abuse of discretion standard); *cf. Tramonte v. Fibreboard Corp*., 947 F.2d 762, 764 (5th Cir. 1991); *Rodriguez v. Olin Corp.*, 780 F.2d 491, 502 (5th Cir. 1986) (both reviewing exclusion of rebuttal witness under abuse of discretion standard).

### B.    *Conduct that is Arbitrary, Capricious, or Without Probable Cause*

Whether an insurance company acted arbitrary, capricious, or without probable cause turns on the facts the insurer knew at the time of its action.  Further, since the issue is primarily factual, deference must be given the factfinder, such that its findings "should not be disturbed on appeal absent manifest error." *Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co*., 706 F.3d 622, 636 (5th Cir. 2013); *see also id.* ("[T]he question of arbitrary and capricious behavior [under the penalty statutes] is essentially a factual issue, and the trial court's finding should not be disturbed on appeal absent manifest error." (quoting *Guillory v. Lee*, 16 So.3d 1104, 1127 (La. 2009))).

In particular, a factual finding on "arbitrary, capricious, or without probable

16

cause" should not be set aside unless an appellate court finds "there is no reasonable factual basis for the finding." *Aghighi v. Louisiana Citizens Prop. Ins. Corp.*, 119 So.3d 930, 932 (La. Ct. App. 4 Cir. 6/19/13) (writ denied).

## C.    *Jury Findings, Motions for New Trials and Judgment as a Matter of Law*

"When a jury's findings are not being attacked directly, but instead are challenged through a district court's decision not to grant a new trial or remitter, the standard of review is one of abuse of discretion." *Vogler v. Blackmore*, 352 F.3d 150, 154 (5th Cir. 2003). "There is no abuse of discretion denying a motion for new trial unless there is complete absence of evidence to support the verdict." *Id.* (internal quotation marks omitted).

A jury's assessment of damages is also difficult to overcome. *In re Air Crash Disaster Near New Orleans, La. on July 9, 1982*, 767 F.2d 1151, 1155 (5th Cir. 1985) (stating as "bedrock principle" that "the determination of the extent of damages is for the trier of fact, and in this area the appellate court should step lightly or not at all"). Rather, "[a]bsent an error of law, the reviewing court will sustain the amount of damages awarded by the fact finder, unless the amount is clearly erroneous or so gross as inadequate as to be contrary to right reason." *Vogler*, 352 F.3d at 154 (internal quotation marks omitted).

Where judgment as a matter of law turns solely on questions of law, a denial is reviewed *de novo*. *Hidden Oaks Ltd. v. City of Austin,* 138 F.3d 1036, 1042 (5th Cir. 1998). But if review requires consideration of evidence, the appellate court

applies the same standard as the district court and thus must "consider all evidence with all reasonable inferences in the light most favorable to the non-moving party." *Id.* (internal quotation marks omitted).

### D.    *Golden Rule Violations*

A district court's actions concerning any potential golden rule violation is reviewed for abuse of discretion. *See Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 179 (5th Cir. 2005). If a violation occurs, however, a party is not entitled to a new trial unless it was "sufficiently prejudiced considering all the facts and circumstances of the case." *Id.* And if the complained-of remarks occur and no objection is made, the objection is waived, and the admission of such evidence is viewed under the "plain error" standard, which asks "whether the error, by its obviousness or otherwise, is such as to seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Adams v. Brown & Root, Inc.*, 688 F.2d 410, 411 (5th Cir. 1982) (internal quotation marks omitted).

### E.    *Other Issues*

A district court's allowance of demonstrative exhibits is reviewed for abuse of discretion. *See Longmire v. United States*, 404 F.2d 326, 327 (5th Cir. 1968) ("The admissibility of demonstrative evidence is largely within the discretion of the trial judge."). A preserved charge objection is reviewed for harmless error, but a failure to preserve error subjects issues to plain-error review.  *Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894, 905 (5th Cir. 1973); *Adams*, 688 F.2d at 411.

ARGUMENT

**I.    The district court had discretion to let the Church call a rebuttal witness to address issues not timely disclosed before trial; in addition, Church Mutual failed to preserve any error.**

**A.    *The district court had discretion to let the Church call a rebuttal witness to address issues not timely disclosed before trial.***

Here, after Church Mutual presented its case, the Church called its HVAC technician (Daigle), who was a former member of the Church, as a rebuttal witness. ROA.3351. Daigle was specifically called in response to Church Mutual's expert witness Gonzalez who introduced both new and contradictory testimony at trial. Church Mutual objected to Daigle on the basis of procedural disclosure grounds, not evidentiary grounds. ROA.3345-48, which as explained *supra* in I.B., means that Church Mutual failed to preserve any error on this issue.

That said, even if Church Mutual made an actual evidentiary objection based on the propriety of permitting the Church to submit any rebuttal evidence, trial courts have broad discretion to permit it (even where it might have been presented in a party's case in chief). *See U.S. v. Brock*, 833 F.2d 519, 522 (5th Cir. 1987).

The overarching question is unfair prejudice to the other party (*e.g.*, if they were somehow denied their own opportunity to present rebuttal evidence). *See Brock*, 833 F.2d at 522. And determining whether or not evidence is rebuttal evidence is within the sound discretion of the trial court. *State v. Turnbo*, 966 So.2d 1220, 1227 (La. Ct. App. 3rd Cir. 2007) (internal quotation marks omitted). Here, there was no abuse of discretion in letting the Church call a witness to counteract

19

previously undisclosed opinions and testimony from Gonzalez:

First, Gonzalez testified that it had rained *inside* the Church prior to Hurricane Laura, and that was testimony he stated for the first time on the stand (*i.e.*, found nowhere in his prior reports or deposition). ROA.3344-48. Gonzalez's testimony, for the very first time at trial, was that he believed it had been actually "raining inside the building,"[7] which not only was new testimony but also directly contradicted his pretrial sworn testimony, where he implicitly admitted that the only evidence of any pre-existing water damage would have occurred with just "a very, very small amount of water." ROA.2549.

Second, and again for the very first time at trial, Gonzalez said the condition of the Church's HVAC system was "one of the worst leaking air conditioners" he had ever seen. ROA.3143.

Third, Gonzalez testified that the outside HVAC unit (which had been dislodged from its slab) was set the wrong way (*i.e.*, rather than having been caused by Hurricane Laura). To fully appreciate the unfair prejudice from this testimony, it is necessary to detail a related litigation fact:

Despite repeated efforts throughout the discovery process to get all photos and documents that had been taken or reviewed by Church Mutual's experts,[8] Church Mutual produced over 800 new photos less than a week before trial. ROA.3179. By

---

[7] ROA.3147 ("It basically is raining inside the building . . . .").

[8] *See* ROA.2410-11; ROA.2560-62; ROA.3179.

contrast, Church Mutual's experts had access to those same photos *for over a year* before trial. ROA.3179.

In an effort to sweep this under the rug, Gonzalez claimed at trial that the new 800+ photos were either irrelevant or already represented in the 60 in his report. ROA.3179-80. Yet the new photos included several items not seen in the ones attached to his report, including:

- photos showing measurements indicative of a significant lean in the brick, demonstrating a structural change (ROA.3185);

- photos showing deep cracks in the brick veneer (ROA.3180); and

- photos of the outdoor HVAC unit having been forced from its slab (ROA.3186-87).

Although the Church was obviously aware of the damage to the outdoor HVAC unit prior to trial, it believed it had not been inspected by Church Mutual or Gonzalez and thus had no reason to believe that issue would be disputed at trial. Nowhere in Gonzalez's report and sworn pretrial testimony, did he mention it, and so the Church never deposed him about it. Likewise, Church Mutual had concealed the photographs (and thus Gonzalez's opinions about it) until right before trial. This was a significant point, for although Gonzalez admitted a hurricane could cause such displacement, ROA.3187 ("it's possible that the wind twisted it"), he nevertheless maintained to the jury that it had been set the wrong way. ROA.3187 ("I don't think [the wind] would torque it. So this [the HVAC unit] may have been set that way.").

Gonzalez's trial allegations as to "raining" inside the Church, "one of the

worst leaking air conditioners," and a wrongly-installed exterior HVAC unit, all went to the core of the Church's claims of significant damages caused by Hurricane Laura and thus required rebuttal. And most importantly, because they were new, they *permitted* rebuttal.

Fortunately, the Church was able to call upon its former member who performed HVAC maintenance for the Church (Daigle). Notably, he had been in the HVAC business for over 15 years, held a HVAC license, and owned his own HVAC business. ROA.3350.

For the past ten years, it was his job to take care of the Church's HVAC units. ROA.3351. He testified that in March 2020 he conducted his regular preventative maintenance of the HVAC units and also inspected the attic. ROA.3352-53.

In particular, in the period between January and August of 2020, he had been in the Church attic no less than five times. ROA.3353. He testified that he saw no HVAC leaks during that entire eight-month period prior to Hurricane Laura. ROA.3354.

Specifically, and in direct response to Gonzalez's new theory that it had rained inside the church, Daigle was directly asked if it was "raining condensation into the church" and he answered no. ROA.3354.

Daigle also directly controverted Gonzalez's testimony that the Church had the worst HVAC leak he had ever seen. ROA.3354-55.

Daigle also testified regarding the outdoor HVAC unit and confirmed that the

HVAC unit had been moved due to wind, ROA.3357, rather than Gonzalez's speculation of improper installation.

In short, since Gonzalez raised new issues at trial that had not been disclosed before the Church's affirmative case, and because Church Mutual finally disclosed 800+ new photos to the Church less than a week before trial, the district court had abundant discretion to permit the Church to call this rebuttal witness.

**B.    *Church Mutual failed to preserve any error on this issue.***

"Rebuttal witnesses are a recognized exception to all witness disclosure requirements." *U.S. v. Windham*, 489 F.2d 1389, 1392 (5th Cir. 1974). Thus, by itself, the "failure" to disclose a rebuttal witness cannot be error, let alone harmful error. *Id.* (holding that there is no obligation to furnish the names of rebuttal witnesses in advance of their testimony). Yet at trial, the only objection Church Mutual made to the Church's rebuttal witness was this erroneous disclosure objection.  ROA.3345-48.

The Church expects that, in reply, Church Mutual may argue against the above points on the grounds that the majority of the rebuttal witness's testimony was elicited to address general HVAC issues having little to do with new pictures or undisclosed expert testimony or theories by Gonzalez.  But any such argument fails because Church Mutual never made any evidentiary objection to the scope of the rebuttal witness's testimony (and makes no plain error argument here).  To reiterate, the only objection that Church Mutual made in the trial court was that rebuttal

witnesses had to be disclosed prior to trial, which was not correct.

## II.  Church Mutual failed to pay the Church's claim within thirty days of receiving satisfactory written proofs of loss.

Section 22:1892 of the Louisiana Revised Statutes controls certain insurer duties.  As relevant here, an insurer has a statutory duty to make a written settlement offer within thirty days of receiving "satisfactory proof of loss." LA. R.S. 22:1892(A)(4).

Church Mutual disputes that it ever even received a satisfactory written proof of loss. But Church Mutual's own corporate representative (Wiggins) testified that it *had* received such proof as of September 25, 2020.  Wiggins also established that Church Mutual's related payment was untimely from the get-go because it was not issued until November 16, 2020:

> Q:    So on 9-25-20 he finishes this estimate . . . .
>
> A:    Correct.
>
> Q:    And on that date the recommendation was made to [Church Mutual to] make an ACV payment to the church, is that correct?
>
> A:    Correct.
>
> Q:    And you understand [. . .] that this was a date that you had satisfactory proof of loss, is that true?
>
> A:    ***As of that moment, yes, for what we investigated . . . .***
>
> Q:    So if you feel like you owe the church a payment, under the law in this state and probably others, that you have 30 days to pay from that date that proof of loss is given, is that correct?
>
> A:    And based upon our guidelines which, again, is what we hope to achieve, yes.

Q:    So that 4138 payment, though, wasn't made until November 16; is that correct?

A:    Correct.

ROA.2739-41.

In other words, as to *only* payment Church Mutual has ever made on this claim, the jury was told by Church Mutual's own representative that Church Mutual failed to pay within thirty days of receiving satisfactory proof of loss.

Church Mutual argues that the only satisfactory proofs of loss that count are those sent directly to an insurer from the insured because the initial proof of loss came to it from a third-party adjuster rather than the Church. But there is no statutory requirement as to what writings can constitute a satisfactory proof of loss, and Louisiana courts have expressly adopted a flexible (*i.e.*, practical rather than hypertechnical) interpretation of the requirement.

Church Mutual argues that a change in the law in 1990 altered this so as to overrule those prior cases establishing the flexible standard. There are two problems with that argument. First, the change in the law provided there had to be some writing documenting the loss (*i.e.*, it couldn't be solely oral), which was satisfied here. Second, and more generally, post-1990 Louisiana cases, including from the Louisiana Supreme Court, continue to require application of a flexible standard. *See Louisiana Bag Co., Inc. v. Audubon Indem. Co.*, 999 So.2d 1104, 1119 (La. 2008) (holding "satisfactory proof of loss" is that which is "sufficient to fully apprise the

insurer of the insured's claims" (internal quotation marks omitted)); *id*. (rejecting argument that specific "form of proof of loss was required").[9]

Church Mutual also contends that Section 22:1892 is penal in nature, and therefore it must be strictly construed. While this is correct, Louisiana courts have refused to adopt a "formal style of proof" in regards to interpreting satisfactory proofs of loss. *Paul v . Nat'l Am. Ins. Co.*, 361 So.2d 1281, 1284 (La. Ct. App. 1st Cir. 6/10/78) (writ refused).[10] Rather, "it is only required that the insurer have actual knowledge of the facts." *Id*. As such, Louisiana courts have found that an insurance company may be "fully apprised" of the loss through its own "personal investigation of the premises." *Id*. And this is still good law today.[11]

Finally, and most significantly, even if the Church were wrong about any relevant aspect of the above argument such that this Court were to find that Church Mutual did not receive satisfactory written proof of loss with respect to the November 16, 2020 payment, that would only impact the judgment's imposition of $2,759.19 in penalties and fees, and, in turn, would at most just require a minimal

---

[9] And even if an alternative construction supported Church Mutual, it could not be adopted given Louisiana precedent. *Durio v. Horace Mann Ins. Co*., 704 So.3d 1159 (La. 2011).

[10] Church Mutual discounts pre-1990 cases, but Louisiana courts still look to them for the context and meaning of "satisfactory proof of loss." *See Harris v. Imperial Fire & Cas. Ins. Co.*, 328 So.3d 1208, 1218 (La. Ct. App. 1st Cir. 2021).

[11] *Harris*, 328 So.3d at 1218.

remittitur of that amount.

Separately, Church Mutual's brief states that there was never a "sufficient proof loss" as to the $223,825.91 awarded by the jury.  Church Mutual's Brief 32. It is somewhat unclear whether Church Mutual means that (1) it never received satisfactory written proof of this loss so as to establish a violation of the statutory timing requirement for payment or whether (2) it is arguing that there was insufficient evidence for the jury to find that Church Mutual acted arbitrarily and capriciously or without probable cause in never paying such amounts. If Church Mutual's argument is just (2), then it is addressed infra Part III.  But insofar as its brief could be read to argue (1), it is an invalid argument:

The Church provided Church Mutual with multiple expert reports in May 2021.[12]  And Church Mutual does not dispute that. Church Mutual's Brief 29. Regardless of whether Church Mutual, or its experts, disagreed with them in whole or part, the fact remains that (1) those reports comprised written proof of loss; and (2) a jury unanimously agreed that the Church suffered over $220,000 in covered losses. Thus, Church Mutual had to make payment within 30 days, yet it paid

---

[12] The Church provided an $268,000 estimate in May 2021 at replacement cost, which doesn't subtract depreciation. That doesn't affect whether Church Mutual failed to comply with La. R.S. 22:1892 because the Church provided an actual cash value estimate to Church Mutual in May 2022.  ROA.2997. By trial, nearly 60 days had elapsed from then and Church Mutual still hadn't supplemented its $4,138.78 payment. Thus, whether Church Mutual received satisfactory proof of loss in May 2021 or May 2022 doesn't matter since Church Mutual paid nothing within 30 days of either.

nothing.

**III. Substantial evidence supported the jury's finding that Church Mutual's conduct in handling the Church's claim was arbitrary, capricious, or without probable cause.**

As noted above, Church Mutual was required to pay the Church's claim within thirty days of satisfactory written proof of loss. In addition, Church Mutual was required to handle the Church's claim with good faith and fair dealing, a continuing duty that does not end with the initiation of litigation and thus exists even to this day. *Sher v. Lafayette Ins. Co.*, 988 So.2d 186, 199 (La. 2008) ("[A]n insurer has a continuing duty of good faith and fair dealing which extends throughout the litigation period . . . ."), *on reh'g in part* (La. 2008); *Montgomery v. State Farm Fire & Cas. Co.*, 103 So.3d 1222 (La. Ct. App. 3rd Cir. 2012) (writ denied) ("Louisiana jurisprudence holds that an insurer's duty of good faith and fair dealing is a continuing tort, and continues until the insurer complies with its duty." (internal quotation marks omitted)).

Under Louisiana law, an insurer's failure to comply with claims-handling standards for arbitrary, capricious or without probable cause, "shall" subject the insurer to a penalty "in addition to the amount of the loss" of at least "fifty percent damages on the amount found to be due." LA. R.S. 22:1892(B)(1)(a).

Importantly, whether an insurer's actions were arbitrary, capricious, or without probable cause "is essentially a fact issue to be determined by the trial court and *not to be disturbed on appeal absent manifest error*." *Louisiana Bag,*

999 So.2d at 1120  (emphasis added).

Further, to establish a violation, an insured need not prove "specific acts" or even "the insurer's state of mind." Rather, the penalizing nature of an insurer's failure to pay can generally be determined from just "survey[ing] . . . all facts and evidence." *Id.* at 1121.

By way of example, when an insurer makes a rudimentary effort – *e.g*., has an adjuster visit the property, take some pictures, and determine some but not all damages – and then the insurer makes an obviously low offer, that alone suffices to impose penalties under § 22:1892. And that's true even if the insurer attempts to "cure the original conduct" by a "readjustment . . . months later":

> "The insurer's duty . . . mandates more than merely sending an adjuster to the insured's property to take pictures and calculate numbers on less than all the damage. It would defeat the purpose of the statute to allow an inadequate and unreasonably low adjustment, done within the requisite time delays, to satisfy the insurer's obligation to the insured. Likewise, allowing a 'readjustment' done approximately six months later to cure the original bad conduct without any penalty would be condoning the insurer's actions."

*Aghighi*, 119 So.3d at 935. Of course, the situation here is worse as Church Mutual didn't even do *any* readjustment.

Nor can an insurer blame an insured who isn't able (themselves) to prove the exact amount of their damages.  Rather, the insurer "must" still tender a "reasonable amount":

> "[A]n insurer cannot 'stonewall' an insured simply because the insured is unable to prove the exact extent of his damages. . . . Where the exact extent of the damages is unclear, an insurer must tender the reasonable amount which is due. . . ."

*Louisiana Bag*, 999 So.2d at 1115 (internal quotation marks omitted); *see also id*. at 1114 ("[T]here can be no good reason—or no probable cause—for withholding an undisputed amount." (internal quotation marks omitted)).

And what occurred here? The Church made a substantial claim for hundreds of thousands of dollars, which a jury unanimously found legitimate, and which Church Mutual made no attempt to reasonably investigate let alone in a timely fashion, and only ever paid $4,138.78 (also untimely) which itself was even less than its own adjuster recommended and did not include payment for some undisputed covered losses (*i.e.*, the carport). Even just those facts would permit a reasonable inference of arbitrary and capricious behavior.

But it wasn't just those facts alone. Church Mutual's glaring mismanagement of the Church's claim was shown by multiple lines of evidence:

For one, the jury heard from the Church's claims-handling expert (Spotts). Spotts was a credible witness with over 40 years of experience and he testified as to the various ways Church Mutual mishandled the claim, ROA.3096-105, including his finding of thirteen items of damage within Church Mutual's expert's estimate that Church Mutual never paid for. ROA.3106-07.

And even Church Mutual's own experts sunk it:

Church Mutual's expert on claims handling (Louis Fey) testified that Church Mutual never paid for the damaged carport, even though Church Mutual's own adjuster (Montano) put it in his adjustment. ROA.3107-08.

At trial, Church Mutual admitted that in deciding to pay nothing beyond $4,138.78, it relied on the report of an engineer (Fecke),[13] who never even went to the property. ROA.2762-63. Church Mutual didn't seem to care or think that was important in denying the Church's claim. ROA.2762-63. Rather, the only licensed engineer who ever visited this property was the Church's. ROA.3299; ROA.330.

Church Mutual's engineer also did not consider the proximity of the Church to the hurricane's eyewall (*i.e.*, within 30 miles), ROA.3307, despite admitting the eyewall's relative location mattered. ROA.3306. He also had no idea how barometric pressure affected buildings, let alone made any calculations. ROA.3309-10.

## IV. Church Mutual cannot escape the jury's finding of bad conduct simply because it paid experts to disagree with the Church's experts.

Church Mutual argues that an insurer cannot be found to have acted arbitrarily, capriciously, or without probable cause so long as it can find an expert who disagrees with the insured's expert. But Louisiana cases don't support this idea. *See, e.g., Montgomery*, 103 So.3d at 1230.

In *Montgomery*, State Farm paid a small portion of a Hurricane Rita claim.

---

[13] The report was co-written by Gonzalez and stamped by Fecke. ROA.3301.

Additional damages were discovered, however, and although State Farm began an additional investigation (and even paid some additional funds unlike Church Mutual) State Farm ultimately became "defensive" and "hired its own experts" (like here) to challenge the amount of the additional claim. The jury decided that State Farm's conduct was arbitrary and capricious.

On appeal, it was clear that (also as here): the insurer had paid some amounts, done some investigation, and even was able to find an expert to disagree with the plaintiff, but the Louisiana court rejected any idea that such actions insulated State Farm from liability:

> "By adopting such a defensive stance . . . , State Farm acted at its own peril and subjected itself to being liable for statutory penalties and attorney fees in the event that its actions were later determined to be arbitrary and capricious. . . .
>
> [W]hile State Farm timely began an investigation of the Plaintiffs' supplemental loss[,] . . . it utterly failed to complete that investigation and to timely adjust the remainder of Plaintiffs' losses. . . .
>
> [T]he fact that State Farm timely paid Plaintiffs' original Hurricane Rita claim and a portion of [the] supplemental claim . . . does not insulate it from being held liable for violating the mandatory [statutory] obligations . . . with regard to its overall handling of Plaintiffs' supplemental claim."

*Id.* at 1230.[14] Here, of course, Church Mutual never even paid anything beyond its

---

[14] *Accord Durio*, 74 So.3d 1159. There, a home was hit by Hurricane Rita, but the

initial payment, which itself was already untimely and unreasonable.

Moreover, after Church Mutual finally produced 800+ photos days before trial, Church Mutual's egregious behavior was revealed to be even more pronounced. In particular, those photos depicted testing that Church Mutual's experts had conducted of the plumbness of a brick wall, and photos demonstrating that its experts had actual knowledge of potential covered damages that its experts had not disclosed in any report (*i.e.*, damages to the outdoor HVAC unit, which Gonzalez agreed could be indicative of wind damages). ROA.3387; *see B. Bennet Mfg. Co. v. S.C. Ins. Co.*, 692 So.2d 1258, 1271 (La. Ct. App. 5th Cir. 1997) (holding that a jury's arbitrary, capricious, or without probable cause finding was not "clearly wrong" when, the jury heard testimony that the defendant performed tests where results were not produced).

Nor does Church Mutual have any authority for a "get out of jail free" card. Rather, its cited authorities hold that an insurer can only overcome findings like the jury made here in "extraordinary circumstances," with the chief example being instances of serious questions as to the very existence of coverage itself. *See*, *e.g.*, *Darby v. SafeCo Ins. Co.*, 545 So.2d 1022, 1029 (La. 1989) (insurer had good reason to believe its insureds had intentionally misrepresented their son no longer lived at

---

parties' engineers disagreed on the amount of damages. The trial court sided with the plaintiff's engineer and found the insurer acted arbitrarily and capriciously when it didn't timely tender funds for undisputed amounts and "acted in a dilatory and non-customer service fashion."

home to avoid having insurance canceled); *Gardiner v. Old Hickory Cas. Ins. Co.*, 529 So. 2d 1324, 1328 (La. Ct. App. 5th Cir. 1988) (insurer had good reason to believe policy did not cover insured's son where insured did not list son as an additional driver); *Headrick v. Pennsylvania Millers Mut. Ins. Co.*, 245 So.2d 324 (La. 1971) (insurer had good reason to think homeowner's coverage was void after police provided evidence that homeowner committed arson).

Here, however, there was no dispute about coverage: wind damage from Hurricane Laura was indisputably covered. ROA.2729. The sole question was how much damage?

And as to that, it is undisputed that the Church provided Church Mutual with multiple expert reports, including an engineering opinion supporting covered damages to the Church from Hurricane Laura; a moisture analysis showing the location and extent of interior water damage; and a cost estimate by an independent adjuster who had even worked for Church Mutual to evaluate hurricane claims, all showing that damages at the Church were *extensive*, with a final cost estimate in the hundreds of thousands of dollars (ROA.2967),[15] and of similar magnitude to what a jury unanimously assessed. ROA.2641-42 (jury verdict of $ 223,825.91, not counting prior amount paid).

Despite this, and despite never issuing a claim denial before closing the claim

---

[15] ROA.3028 (ACV calculation of $243,825.91).

on November 16, 2020 (ROA.2734; ROA.3575), despite remaining to this day under Louisiana statutory duties to promptly pay for covered damages, and despite not even challenging here that the Church's actual damages *vastly* exceeded $4,138.78, that small amount still remains the only amount Church Mutual has ever paid.

For these reasons, this Court should affirm the district court's judgment that Church Mutual failed to timely pay all amounts owed and that its claims handling was arbitrary, capricious, or without probable cause.

## V.   The jury was not required to determine actual cash value based on prices as of the date of loss and, even if that were the standard, Church Mutual waived any error by not properly objecting to the charge.

At trial, Church Mutual made no objection either to the jury charge or to any evidence regarding the timing of when to calculate actual cash value damages. Specifically, Church Mutual did not either request a different or additional definition or instruction regarding actual cash value or specify that it must be determined as of the date of loss. ROA.3029. As such, Church Mutual has failed to preserve either charge or evidentiary error.

Three cost estimates were presented to the jury: (1) one from Gonzalez, Church Mutual's causation and cost expert (ROA.4715-4732); (2) one from Montano, Church Mutual's adjuster (ROA.4657-4666); and one from Bunn, the Church's cost expert (ROA.4017-4048). None used the August 2020 pricing database Church Mutual is now demanding.

All three estimates were admitted without objection. ROA.2655. Two

(Gonzalez and Bunn) used the same May 2021 pricing database. Montano used the September 2020 database from the month of his inspection. Since Church Mutual's own evidence used a different standard than what it now urges, it has invited any error it now complains of.[16]

Church Mutual says the policy should be construed so that damages are measured by market prices in effect at the time of loss. Yet it admits that its own estimator (Montano) didn't do so. Apparently, this is okay because it was "more" close in time to August 2020 when the hurricane occurred. Church Mutual's Brief 44. But if the policy can reasonably be viewed on "more" versus "less" terms, that just confirms the district court's ruling that the policy is ambiguous. And certainly, Church Mutual has made no argument that its expert's estimate (which used the same May 2021 pricing database as the Church) was wrong. Rather, Church Mutual is entirely silent on that. Why is its expert right and the Church's expert not?

And despite Church Mutual's assertion it was prevented from traversing two of the Church's experts and directing its own expert on this line of questioning, Church Mutual failed to make any offer of proof as to what such testimony would have established, and there is no reason to think any such testimony would have assisted the jury: Church Mutual's witnesses used price lists different from what it

---

[16] Invited error occurs where introduction of allegedly inadmissible evidence is attributable to complaining party; it imposes a "manifest injustice" standard above plain-error review. *Munoz v. State Farm Lloyds*, 522 F.3d 568, 573 (5th Cir. 2008); *United States v. Salazar*, 751 F.3d 326, 332 (5th Cir. 2014).

now urges.

Additionally, the jury did hear evidence that actual cash value should be based on pricing at or close to the time of the hurricane. ROA.2763-64. Thus, nothing kept the jury from using that principle to determine the amount needed to make the Church whole, economically, under the jury charge (which did not specify a pricing database the jury had to use).

But even if Church Mutual can overcome its failure to preserve charge and evidentiary error, its policy interpretation is wrong.

At issue is the policy's meaning of actual cash value, <u>as it relates to damages after a loss</u>. The Church's interpretation is that there are two methods to determine actual cash value in the policy – one for calculating *damages* after a loss and one for calculating the overall value of the property after a loss to see if a coinsurance penalty applies. Church Mutual urges this Court to believe that the two methods are the same, such that the way to determine damages is the same as to determine property valuation for coinsurance issues. This is incorrect, as the policy language, caselaw, and applicable statute make clear:

La. R.S. § 22:881 states that "[e]very insurance contract shall be construed according to the *entirety* of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy" (emphasis added). "The terms of an insurance contract must be interpreted consistently so as not to render portions of the policy of

no significance, surplusage, or meaningless." *Zeitoun v. Orleans Parish School Board*, 33 So.3d 361, 367 (La. Ct. App. 4th Cir. 2010).

As it relates to calculating damages, this Court has determined that for policies like these, you first look to the "Loss Payment" section. *GuideOne Elite Ins. Co. v. Mount Carmel Ministries*, 676 F.App'x 269, 275 (5th Cir. 2017). This makes sense because the "Loss Payment" section explicitly says it is used in determining "the value of lost or damaged property." ROA.4460. This Court also stated that in determining the value of "lost or damaged property, or the cost of its repair or replacement," the parties must look to the Valuation Condition, which is found on the declarations page. *GuideOne Elite Ins. Co.*, 676 F.App'x at 275; ROA.4460. Here, the Valuation Condition is Actual Cash Value. ROA.4411. The declarations page also shows a coinsurance percentage of 80%.

A coinsurance penalty arises when a property is underinsured: *i.e.*, when the covered property's value at the time of loss discounted by the coinsurance percentage exceeds policy limits. ROA.4462.[17] For example, if a structure worth $100,000 were only insured for $75,000, there would be a coinsurance penalty because $75,000 is less than ($100,000 *x* 80%). Given the above provisions, an insurance company cannot determine the applicability of any coinsurance penalty

---

[17] ROA.4462 at D.1.a ("We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations Page is greater than the Limit of Insurance for the property.").

(based on a property being underinsured) unless it first determines the value of the property at the time of loss.

After determining that the valuation is actual cash value, you must then see if there is a definition for "actual cash value." The policy specifically states that words and phrases in quotations have special meaning and references the "Definition" section. ROA.4459. Here, "actual cash value" appears throughout the policy in quotations, and its definition, as found in the "Definition" section is "the amount it would cost to repair or replace Covered Property with material of comparable kind and quality, less allowance for deterioration and depreciation, including obsolescence." ROA.4465. Church Mutual (at 43) agrees this is the definition of actual cash value, yet nowhere in the definition is any reference to the *timing* of calculating actual cash value.

And so this is where the parties diverge. The policy uses two phrases – "value of lost or damaged property" and "value of Covered Property." *See* ROA.4460;[18] ROA.4461. Church Mutual would have these phrases mean the same and, in turn, render one meaningless. Covered Property is defined by the policy as the "building, meaning the building or structure described in the Declarations Page . . ." ROA.4473. Notably, Covered Property has <u>no</u> reference to just *damaged* property. It is the entire

---

[18] ROA.4460 ("In the event of loss or damage covered by this Coverage Part . . . we will . . . [p]ay the value of lost or damaged property; . . . We will determine the value of lost or damaged property . . ."); *cf.* ROA.4461 ("[W]e will determine the value of Covered Property in the event of loss or damage at 'Actual Cash Value[.]' ").

property being insured *as a whole*.

The "Valuation" section that Church Mutual references only mentions "the value of Covered Property" and never mentions the phrase "value of lost or damaged property." ROA.4461. Therefore, at trial, the Church objected that there is an ambiguity, and the Court agreed. ROA.3012-14.

In assessing this, this Court must adopt the interpretation that would favor the insured[19] and "fulfill the reasonable expectations of the parties in light of the customs and usages of the industry." *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 207 (5th Cir. 2007). Here, both the Church's expert in claims handling (Spotts) and Church Mutual's causation expert (Gonzalez) agreed the correct way to estimate losses in the insurance industry is to use the most current database at the time you are reviewing the damages, so as to capture any potential market fluctuations in pricing for labor and materials. ROA.3101; ROA.3192-93. And both Spotts and Gonzalez provided this testimony with no objection by Church Mutual.

This is also supported by Louisiana jurisprudence. In determining "actual cash value," one should "consider[s] original cost, possible appreciation and depreciation, the nature of the property lost and the current replacement cost." *Bingham v. St. Paul Ins. Co*., 503 So.2d 1043, 1045 (La. Ct. App. 2d Cir. 1987) (emphasis omitted). The

---

[19] *Reynolds v. Select Properties, Ltd*., 634 So.2d 1180, 1183 (La. 1994); *see Coleman v. School Board of Richland Par*., 418 F.3d 511, 517 (5th Cir. 2005) (ambiguities within exclusion or policy as whole must be construed to favor coverage).

only limit is that the result cannot "exceed[] the amount which it would cost to repair or replace the property with material of a like kind and quality." *Id*. (internal quotation marks omitted).

Finally, as relevant here, when determining actual cash value, "an adequately insured person should incur neither economic gain nor loss." *Id*.

The court here gave the jury this definition:

> "[a]ctual cash value is the reproduction cost less depreciation. Stated another way, it is the cost of duplicating the damaged property with materials of like kind and quality, less allowance for existing physical deterioration and depreciation. You may award damages on an actual cash value basis, an amount equal to the cost of restoring the property to its condition before Hurricane Laura, less any applicable deductible and any prior payments. The touchstone for determining actual cash value is to put the insured in exactly the same position as he or she is right before the loss. An award of actual cash value should provide the insured with neither economic gain nor loss."

ROA.3393-94.

The key point here is that Church Mutual has no reasonable interpretative argument or applicable authority that the actual cash value provision limits the calculation of <u>damaged</u> property to the time of loss. Rather, cases cited by Church Mutual primarily assess which kind of benefits are owed (replacement cost versus actual cash value). Accordingly, Church Mutual's interpretation of the policy is wrong but even if it weren't, since the Church's is at least reasonable, any ambiguity must be construed in its favor.

## VI.    The Church's use of a demonstrative showing agreed-upon industry rules and standards was not error, let alone harmful.

Over one week before trial, the Church's counsel provided Church Mutual's counsel with copies of all demonstratives the Church planned to use at trial. *See* ROA.2563.

Right before trial commenced, Church Mutual's counsel made a blanket objection to every demonstrative (ROA.2657), including one labeled "Insurance Claims Rules & Standards."[20]

Notably, Church Mutual's expert (Fey), corporate representative (Wiggins), and adjuster (Montano), all agreed that the six items listed on the board were standards that govern the insurance industry that Church Mutual had to follow when adjusting claims. ROA.3231; ROA.3035; ROA.3037-40; ROA.2698; ROA.2702-05.

In bold capital letters, the demonstrative stated that these were rules and standards for insurance claims, *not* "rules of law," and the Church's counsel told the district court, the demonstrative was just meant to "illustrate . . . standards that govern insurance companies." ROA.2660.

Church Mutual objected to one thing on the demonstrative: the word "rule." ROA.2661. Church Mutual's objection was meritless because that's exactly what

---

[20] The board was just a demonstrative, not an exhibit or given to the jury.

the listed items were,[21] and all of them came from insurance industry standards.[22]

Indeed, Church Mutual's own expert (Fey) and his report cite and discuss the very industry standards those rules came from:

> "[I]nsurance industry standards . . . are standards that have been developed by the industry over many years that apply to claim handling in all jurisdictions. These standards are generally accepted industry principles all adjusters and insurers are expected to follow, understand, and apply to their everyday claim practice."

ROA.4795; *id.* ("All state unfair claim practice standards are in line with these industry standards.").

Fey gives the following example of "well-founded and long-standing industry standards":

> "The primary duty of the claim representative is to deliver the promise to pay. Therefore, the claim representative's chief task is to seek and find coverage, not to seek and find coverage controversies or to deny or dispute claims."

ROA.4796 (emphasis omitted).[23]

Notably, Rule 2 on the Church's demonstrative exactly corresponds to that:

> "Insurance companies must seek and find coverage, not seek and find coverage controversies . . . ."

---

[21] *See* https://www.merriam-webster.com/dictionary/rule (rule is "a prescribed guide for conduct or action").

[22] Although Church Mutual had a problem with "rule," it referred to the listed standards as such when speaking to the jury. ROA.3377.

[23] This is from an industry publication. *Id.*

ROA.2324.

Fey also provides these good-faith claims-handling requirements:

> "Investigations should seek to discover the facts and consider all sides of the story. Claim representatives should not appear to be looking for a way out of the claim or for evidence to support only one side."

ROA.4797.[24]

And Rule 3 on the Church's demonstrative corresponds to that:

> "Insurance companies must give equal consideration to the insureds' interest as their own. This includes giving equal consideration to evidence submitted by the policyholder supporting their claim."

ROA.2324.

Fey also cited minimum standards the National Association of Insurance Commissioners promulgated relating to the industry's custom and practice that constitute "bad faith," including:

> "Refusing to pay claims without conducting a reasonable investigation."

ROA.4799.

And Rule 5 on the Church's demonstrative reflects this:

> "Insurance companies must conduct a reasonable investigation."[25]

---

[24] This is from an industry publication. *Id.*

[25] One NAIC unfair claims practice is "Refusing to pay claims without conducting a reasonable investigation[.]" ROA.4799.

Fey testified that he agreed with every standard on the Church's demonstrative. ROA.3231.  And he did so with no objection from Church Mutual.

Nor could anyone have thought these rules and standards were something the Church came up with. Fey himself testified that they were longstanding industry standards. ROA.3233.

Similarly, when discussed before the jury, these rules were called insurance rules or industry standards, not "rules of law." *E.g*., ROA.2670-71 ("What brings us to this Lake Charles courthouse here today are the insurance rules . . . . These insurance rules . . . .").

Church Mutual's corporate representative (Wiggins) agreed that each and every one of these standards are the practices that should be followed in insurance claims. ROA.2699-705.

And during his testimomy, Church Mutual's claims adjuster (Montano) specifically agreed with these industry standards as they appeared on the Church's demonstrative, with no objection from Church Mutual. ROA.3034-40. And in closing, counsel for the Church reiterated that these rules were industry standards. ROA.3367.

In short, Church Mutual misrepresents the Church's use of the word "rule." From opening statements, through the testimony of each witness, through closing argument, and from the title of the demonstrative itself, the word "rule" uniformly was used to refer to industry standards, not "the rule of law." Nor does Church

Mutual cite a single instance when any industry standard or rule was said to be law.

Church Mutual has no basis to suggest that the Church's demonstrative was confusing or misleading, or that the district court committed error, let alone harmful error, in permitting it.

## VII.  The Church did not ask the jury to put themselves in the plaintiff's shoes, let alone award damages on any such basis, nor can Church Mutual show harmful, let alone plain, error.

A golden rule violation occurs if a party asks the jury to "put themselves in the shoes of the plaintiff, and do unto him as they would have done unto themselves under similar circumstances." *Brown*, 410 F.3d at 180.  But here, the Church never asked the jury to place itself in the Church's shoes, either in opening statements or otherwise.

Moreover, just asking a jury to place itself in the plaintiff's shoes is not even a golden rule violation. *See Stokes v. Delcambre*, 710 F.2d 1120, 1128 (5th Cir. 1983) ("The use of the Golden Rule argument is improper only in relation to damages. It is not improper when urged on the issue of ultimate liability."). And no testimony, questioning, or counsel statements cited by Church Mutual relates in any way to damages:

First, Church Mutual takes issue with some statements in the Church's opening statement. But none of them asked the jury to put itself in the shoes of the plaintiff, let alone as a basis for awarding damages.  Nor did Church Mutual object to any of the Church's opening statements.

In addition, every statement Church Mutual complains about is, at bottom, a factual matter directly supported by witness testimony or else comes from sources whose accuracy cannot be seriously questioned.

For example, Church Mutual complains that in its opening statement, the Church mentioned the number of Hurricane Laura insurance claims.  That is not a golden rule violation but just a fact based on reliable data from the Louisiana Department of Insurance.[26] ROA.2670.

Likewise, Church Mutual complains that the Church said that insurance rules are in place to protect the community, homeowners, and churches.  Yet that is exactly the purpose of those standards, as acknowledged before the jury by Church Mutual's own claims handling expert:

> Q:   . . . The public needs protection from insurance companies, right?
>
> A:   Correct. . . .

ROA.3236.

Church Mutual complains that the Church said insurance companies should be accountable for the financial safety of their consumers and that an insurance policy is essentially a promise (*i.e.* a contract).  Once again, these are not only true but also so well-known as to be common sense.

---

[26] *Insurance Commissioner Recognizes those Affected by Hurricane Laura*, La. Dep't of Ins. (Aug. 19, 2021), *available at* https://tinyurl.com/2s3wr6ba (175,160 claims).

Church Mutual complains that the Church said Lake Charles was "devastated" after Hurricane Laura and it was as though a bomb went off.  That's also true, and exactly what Church Mutual's own adjuster (Montano) said and agreed to:

> Q:    You were in Lake Charles on September 23rd for your inspection. What did it look like?
>
> A:    It was devastated.
>
> Q:    Looked like a bomb went off?
>
> A:    Yes.

ROA.3036.

And there is no error, let alone harmful error, in accurately telling a jury what witnesses have said or are expected to say and then, in fact, say.

Church Mutual also complains that the Church said there were over 3,000 cases like this one in federal court. Again, this is just a fact.[27]

Church Mutual complains that the Church said "you're going to be here for everyone." By flagging that statement, Church Mutual is apparently arguing that the statement was a request for the jury to vindicate "everyone's" grievances with insurance companies. It is frivolous for Church Mutual to insinuate that the statement had that meaning:

In context, "everyone" was not a reference to the public at large. Nor was

---

[27] Maschke, Alena, *"Ground zero": One in five federal insurance lawsuits nationwide filed in Lake Charles*, THE ADVOCATE (Oct. 21, 2022), *available at* https://tinyurl.com/2madkrp7 (3,430 suits).

"you're going to be here" a reference to the jury acting on behalf of others. Rather, the statement was a statement that, in opening, the Church's counsel *was not going to summarize in advance everything the witnesses were going to testify about because the jurors themselves were going to be present* (*i.e.*, "going to be here" in the courtroom) for *every one of the witnesses who are being called to testify* (*i.e.*, "everyone" meaning the witnesses not the public). There is no way in the world to connect such a statement to a golden rule violation and it is simply wrong to suggest it. ROA.2682.

After attacking these statements in the Church's opening, Church Mutual turns to closing arguments. As with opening statements, Church Mutual did not object even once. As such, even if any comment were found improper, it must be assessed under the plain error standard, which asks if the error would "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Adams*, 688 F.2d at 411.

To make its argument, Church Mutual cuts, pastes, and combines individual phrases and sentences from the Church's closing without giving context. The majority of what Church Mutual complains of appears immediately after a discussion to the jury of the rules or standards that they had heard so much about at trial. As discussed *supra* Part VI, the jury heard significant testimony from claims handling experts on both sides as to why insurance rules exist and how they serve to protect the public's greater good. The statements that Church Mutual now complains

about (relating the history of insurance companies taking advantage of their insureds; reminding the jury that these insurance rules serve to protect the community in general; and recapping testimony heard from Church Mutual's own corporate representative as to the number of trials for cases such as this one Church Mutual was a part of) just canvass evidence the jury already heard. Given that context, there is no basis for reading them as asking the jury to step in the shoes of the Church or award damages on that basis.

Indeed, even if Church Mutual made any timely objection, the result would be the same. In such situations, a reviewing court determines if an impropriety occurred by looking at any objections, the court's ruling, the jury charge, and any corrective measures given by the trial court, including specific jury instructions. *United Capitol Ins. Co. v. Pontotoc Elec. Co.*, No. 98-60195, 1999 WL 800009, at *1 (5th Cir. Sept. 14, 1999) (per curiam) (unpublished).

Here, the district court expressly instructed the jury that statements of counsel are not evidence, but only arguments. ROA.3386. The district court even stressed this point, telling the jury that "[i]t is important for you to distinguish between arguments of counsel and the evidence in which those arguments rest. What the lawyers say or do is not evidence. You may however consider their arguments in light of the evidence that has been admitted and determine whether the evidence admitted in this trial supports their arguments. You must determine the facts from all of the testimony that you've heard and the other evidence submitted." ROA.3386-

87.

As such, even if any of statements were somehow "improper," the district court's instructions would be expected to cure any alleged prejudice. *United Capitol Ins. Co.*, 1999 WL 800009, at *1.[28]

Moreover, the jury had a sound evidentiary basis for its damage award that simply cannot be viewed as having anything to do with an "emotional appeal." The jury heard direct testimony from an independent adjuster who worked for Church Mutual adjusting these types of losses. He testified that the Church's losses were $243,825.19. ROA.3028. The jury subsequently assessed those losses at $223,825.19, which is comparable, but less, than the independent adjuster's opinion, and so there is no way to say punitive or emotion-based damages were somehow awarded. ROA.2641-42. *See, e.g. Wallner v. Ziegler*, 470 F.App'x 230, 233 (5th Cir. 2012) ("in the instant case, with respect to compensatory damages, the jury awarded [the plaintiff] what he invested in the ventures . . . Thus the verdict does not plainly indicate the remarks prejudiced the jury. . . . to the extent counsel's statements were improper, the weight of the evidence presented at trial minimized any prejudicial effect of such statements." (internal citations omitted)).

Finally, it must be kept in mind that closing argument is when trial counsel is

---

[28] *See also U.S. v. Arce*, 997 F.2d 1123, 1130 (5th Cir. 1993) (harmless error where allegedly improper prosecutorial remarks were brief, court told prosecutor to stick to evidence, and evidence against defendant was strong).

permitted "reasonable latitude" to make "forceful arguments" to the jury. *Whitehead v. Food Max*, 163 F.3d 265, 275 (5th Cir. 1998). And here, whether the remarks are classified as forceful or not, there is just no fair basis to think the jury was improperly swayed.  *See U.S. v. Cochran*, 697 F.2d 600, 607 (5th Cir. 1983) ("We do not view juries as emotional slot machines and do not suppose them to be so. Instead we review this type of hyperbolic statement with some level of confidence in the maturity of twelve citizens . . ."). Indeed, as explained above, there was no hyperbole here, just facts supported by evidence, none of which constituted harmful error, let alone plain error.

Church Mutual also says the Church's claims-handling expert (Spotts) made a golden rule violation. But Church Mutual again omits the context.  During direct examination of Spotts, the Church's counsel covered the insurance industry standards that were discussed throughout trial. As an illustration of both the importance of and need for so many standards, Spotts analogized to teenagers, stating that there would be a "breakdown" in the system if there weren't a lot of rules.

Such a statement does not ask the jury to put themselves in the Church's shoes or make any decision on the basis of something other than the evidence. It's a humorous and relatable analogy about the importance of adhering to industry

standards.[29]

Finally, Church Mutual quotes testimony from Spotts about "society at large being harmed" as a golden rule violation. Once again, Church Mutual did not object to this testimony or the line of questioning, ROA.3094, nor could it be harmful, let alone plain error as Church Mutual's own expert (Fey) testified to the same thing when he acknowledged (by negative implication) that the public needs protection from insurance companies if they aren't doing their jobs. ROA.3236-37.

In addition, parts of Fey's report, introduced into evidence, at Church Mutual's request, included extensive quotations concerning industry standards and the harms that can result when insurers violate them. *See* ROA.4795-99.

Certainly, if Church Mutual's own expert agreed that the public can be harmed when insurance companies fail to honor their promises, it's a permissible statement regarding what a reasonable insurance company should not do, not a golden rule violation.

Again, Church Mutual did not make a single golden rule objection at trial to any statements by counsel, witness questioning, evidence, or demonstratives, either before the jury or outside its presence. Nor did the Court prohibit the parties from making such objections.[30] And while this Court can relieve a party of its failure to

---

[29] If a golden rule argument just relates to the reasonableness of actions, there's no harmful error. *Burrage v. Harrell*, 537 F.2d 837, 839 (5th Cir. 1976).

[30] The court addressed many issues pretrial to limit need for objections but imposed no gag order. ROA.2656-2669.

preserve error, Church Mutual has shown no harmful error, let alone plain error, given the substantial evidence of Church Mutual's failure to adhere to basic industry rules and absence of any emotion-laden appeal or outcome.[31]

## VIII. Church Mutual's remaining issues are subsumed within the above arguments.

Church Mutual lists some issues without specific subject matter (whether the verdict and judgment were contrary to law or clearly erroneous and whether the district court erred in denying its post-judgment motions). The Church understands these to be umbrella issues for prior arguments made, which the Church has addressed above. The Church thus submits that the answer to these additional issues is therefore "no" for the reasons given in the arguments above.

### CONCLUSION

For these reasons, the judgment should be affirmed. The Church also requests any such other and further relief to which it may be entitled.

Respectfully submitted,

By:    /s/ Nishi Kothari
        Clint Brasher
        Louisiana State Bar No. 29540
        clint@brasherattorney.com
        Nishi Kothari
        Louisiana State Bar No. 39655
        nishi@brasherattorney.com
        BRASHER LAW FIRM, PLLC
        1122 Orleans St.
        Beaumont TX 77701

---

[31] *Cochran*, 697 F.2d at 607 (no plain error even where prosecutor called drug dealer's cocaine "sack of white death").

Telephone: (409) 832-3737
Facsimile: (409) 832-3838

Jeremy Gaston
Texas Bar No. 24012685
jgaston@hcgllp.com
HAWASH CICACK & GASTON LLP
3401 Allen Parkway, Suite 200
Houston TX 77019
713-658-9015 (tel/fax)

***Counsel for Appellee***

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because this brief contains 12,994 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface and typestyle requirements of Rule 32(a)(5), (6) and Circuit Rule 32.1 because this brief has been prepared in a proportionally-spaced typeface in Microsoft Word using 14-point Times New Roman font for body text and footnotes.

*/s/ Nishi Kothari*
Nishi Kothari

## CERTIFICATE OF SERVICE

I hereby certify that, pursuant Federal Rule of Appellate Procedure 25(b) and

(c), a true and correct copy of the foregoing **BRIEF OF APPELLEE** was served on June

12, 2023, via the Court's ECF filing system on the following counsel of record for

appellant:

Sidney W. Degan
sdegan@degan.com
Travis L. Bourgeois
tbourgeois@degan.com
DEGAN, BLANCHARD & NASH
400 Poydras Street, Suite 2600
New Orleans, Louisiana 70130

Daniel A. Webb
dwebb@beahm.com
BEAHM & GREEN
145 Allen Toussaint Blvd., Suite 400
New Orleans, Louisiana 70124

       */s/ Nishi Kothari*
       Nishi Kothari